Larry BRISTER, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Bobby BRISTER, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Linda Gayle PESNELL

v.

GULF CENTRAL PIPELINE COMPANY, et al.

SUCCESSION OF J.O. GRIFFIN

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Edroe T. PESNELL, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Claude L. PESNELL, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Mike GRIFFIN, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Raymond CALDWELL, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Hollis L. SPILLERS, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Vicki Janell GRIFFIN

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Harold L. PESNELL

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Jack FARMER, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Edroe T. PESNELL, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Mike GRIFFIN, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Randy BRISTER, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Raymond CALDWELL, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Pam FARMER, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

O.R. GRIFFIN, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

W.J. PESNELL, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Vannie M. GRIFFIN

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

T.S. PESNELL, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Mary W. SMITH

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

C.J. UNDERWOOD, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Raymond S. CALDWELL, Jr.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Civ. A. Nos. 82–1069 to 82–1089,
82–1380, 82–1437 and 82–1485.

United States District Court,
W.D. Louisiana,
Monroe Division.

June 21, 1985.

Robert E. Shadoin, Ruston, La., Charles D. Jones, Benjamin Jones, David E. Verlander, III, William G. Kelly, Jr., Monroe, La., Mark A. Goodwin, Shreveport, La., for plaintiffs.

Donald E. Walter, Gordon E. Rountree, Shreveport, La., J. Bachman Lee, Monroe, La., John R. Smith, Center, Tex., for defendants.

## OPINION

NAUMAN S. SCOTT, District Judge.

Trial of this matter to date has been restricted to the determination of Reliance Insurance Company's (Reliance) comprehensive liability coverage, if any, of Shelby County Construction Service, Inc. (Shelby) incidental to an occurrence of May 27, 1981. Included also is the liability, if any, of Shelby's insurance agent, Kathleen Woods (Woods), an officer and employee of Insurance Consultants of Shreveport, Inc. (Consultants), Consultants, and St. Paul Fire and Marine Insurance Company (St. Paul), their errors and omissions carrier.

### FINDINGS OF FACT

1. On May 27, 1981, Shelby was working on property owned by Crown Zellerbach under a verbal contract with Mitchell Energy and Paramount Drilling Company (Mitchell), the mineral lessee. While burying trash, a bulldozer operated by a Shelby employee punctured an ammonia pipeline owned by Gulf Central Pipeline Company (Gulf), causing an explosion.

2. Prior to the explosion, Mr. Pouyer (Pouyer), President of Shelby, commissioned Woods to obtain insurance coverages necessary for him to do business in Louisiana and Texas. Woods had told him that she had experience in writing insurance for oilfield site preparation. Pouyer never discussed types of coverage or liability limits with Woods, nor did he discuss his company's operations in detail. After initially meeting with Pouyer, Woods spoke to him only by telephone.

3. Pouyer's secretary, Gwenyth Carlos (Carlos), was primarily responsible for the day-to-day office operations of Shelby, including the handling of insurance matters. Woods traveled to Shelby's headquarters in Center, Texas, and met with Carlos. They discussed the land clearing operations conducted by Shelby which had been principally the clearing of commercial sites and had gradually changed until 90 to 95% of the work done in May 1981 consisted of the clearing of oil well drilling sites. Woods

was provided an equipment list and a list of companies with which Shelby did business. She was provided access to Shelby's insurance file, which included old insurance policies, setting forth the risks and limits, endorsements, and insurance certificates. During this visit, Woods and Carlos discussed the type of operations Shelby was primarily engaged in, the different kinds of insurance, including the classifications of risk under the general comprehensive liability policy, and liability limits. The prior policy provided for $500,000 bodily injury and property damage, both per occurrence and aggregate. Shelby's work was classified in those policies as "grading of land". Shelby had no umbrella coverage under the prior policies. Woods agreed that any coverage for underground activities would be done on a job-by-job basis.

7. Woods agreed to secure the types of coverages needed for Shelby's operation. Based on her discussions with Carlos and Pouyer, Woods instructed Bobbie Roberts (Roberts), an office employee at Consultants, to prepare the necessary applications. (Mitchell # 1). In the normal course of business, Woods instructs employees to obtain all coverages, knowing that some may be cancelled if the insured is unhappy. In this case, Woods requested that Roberts apply for workman's compensation insurance; general comprehensive liability; an equipment floater; automobile liability, all effective with the lapse of the then current policies (May 27, 1981); and an umbrella with no proposed effective date. In addition, Woods requested that there be no exclusions for underground hazards and that the classification "grading of land" be used on the general comprehensive liability policy.

8. Roberts produced the following documents:

*RELIANCE # 1:* This is an accord form commercial insurance application dated April 27, 1981. The sections attached to the application are designated as "general liability", "business auto", and "worker's compensation". The application requests that Reliance issue these policies with a proposed effective date of May 27, 1981. An umbrella policy section is also attached.

*RELIANCE # 3, # 4 & # 5:* These are individual accord application forms for specific coverages. Reliance 3 is the general liability section. This document is dated April 27, 1981 with a proposed effective date of May 27, 1981 for the policy. The application requests comprehensive general liability coverage and manufacturers and contractors coverage. Limits of liability are $500,000 per occurrence and $500,000 aggregate for bodily injury, and $100,000 per occurrence and $100,000 aggregate for property damage. The application gives a rating classification of "the grading of land —07313". No options are checked, i.e., no requests are made in the option block for X, XCU, or U coverage. Reliance # 4 is a business auto application also dated April 27, 1981 with an effective date of May 27, 1981 for the policy. Reliance # 5 is an inland marine application.

*RELIANCE # 6:* This is the umbrella liability policy application. This application requests a "Quote". There is no request for a binder or a policy. The application also sets forth no proposed effective date for the policy. By Reliance practice, however, an umbrella policy is effective concurrent with the underlying Reliance coverages—in this case, on May 27, 1981. The desired limit for the quotation is $1 million liability coverage.

9. On May 5, 1981, after receiving these applications, Reliance's casualty underwriter, Jack McComas (McComas), had a phone conversation with Woods concerning those applications and challenging the classification of Shelby's work as "grading of land" on the comprehensive general liability policy. McComas suggested that Shelby's work should be properly classified as "oil lease work by contractor". Accordingly, they agreed in June 1981 to add that as a classification on the policy, and also agreed that any underground coverage would be on a job-by-job basis.

10. Shortly thereafter Woods issued written insurance binders to Pouyer with respect to the equipment floater—undated

and unsigned, effective May 13, 1981—and the other coverages, including comprehensive general liability (Bodily Injury $500,000 and Property Damage $100,000)—dated May 13, 1981, signed and effective May 27, 1981. (Reliance #7 and #8). Woods gave no notice to Shelby or Reliance prior to the execution of this binder.

11. No written binder was issued for the umbrella policy.

12. Certificates of insurance were also issued by Woods to Mitchell, the first being dated May 27, 1981, certifying that general liability, auto, and worker's compensation policies were in effect. (Reliance #12). This certificate of insurance does not reflect that an umbrella policy was in effect.

13. On May 27, 1981, the accident occurred. At a meeting following the accident, Woods confirmed to all parties that Shelby was covered (including the umbrella coverage) for the loss, or if not, she was insured for her own errors and omissions which caused any lack of coverage.

14. On June 1, 1981 the comprehensive general liability policy was written. (SCC #1, at 16). It states that the policy is effective from May 27, 1981 to May 27, 1982. Liability for bodily injury is limited to $500,000 per occurrence and $500,000 aggregate and $100,000 per occurrence and $100,000 aggregate for property damage. The business of Shelby is stated as "grading of land contractor". The policy describes the hazards for premises/operations as "Louisiana: grading of land—07313XCU; street or road construction—clearing of right-of-way, excavation, filling or grading bridge or culvert building—1615XCU." (SCC #1 at 21). The policy also describes these same hazards on the following page with the same classification code number but without the symbols XCU. (SCC #1 at 22). Nowhere in the policy is the term "grading of land" defined.

15. On June 4 & 5, 1981, Woods and McComas discussed the Shelby account by telephone. Reliance #10). According to McComas' notes, he confirmed the binding of XCU on a blanket basis (before it had been job-by-job) or for a $1 million umbrella. Woods and McComas agreed to increase the insured's property damage limits to $250,000 per occurrence and $250,000 aggregate. McComas informed Woods that he would get an umbrella quote by Tuesday, June 9.

16. On June 5, 1981, Woods issued a certificate of insurance setting forth the increased liability limits. (Reliance #13). This certificate reflects the addition of underground hazard coverage effective May 28, 1981. The certificate does not show that umbrella coverage was provided to Shelby.

17. On June 8, 1981, Woods sent a memorandum to McComas to add an "oil lease work by contractor" classification effective May 27, 1981—i.e. back date the endorsement to the date of the accident. (Reliance #16). This was done. (SCC #1 at 15). The code numbers for this classification are 13991.

18. On June 8, 1981, Woods also asked that the umbrella coverage be bound in the amount of $2 million. (Reliance #11).

19. On June 9, 1981, the umbrella policy was issued. (Reliance #15). It provided for a $2 million limit of liability. The effective date was June 8, 1981 to May 27, 1981. Woods also issued a new certificate of insurance to Mitchell setting forth the additional property damage coverage ($250,000/$250,000) and the umbrella of $2 million. (Reliance #14).

20. At trial, Woods emphatically testified that she orally bound the umbrella policy for $1 million effective May 27, 1981. As was true in the case of the written binders, there is no evidence that she gave notice to Reliance or to the insured that she intended to bind the umbrella coverage. Woods possessed all the knowledge necessary to effect a binder, including the subject matter, the duration of the policy (concurrent with the underlying coverages), the risk, and the amount of insurance (at a minimum, $1 million).

21. Woods' agency agreement with Reliance provides, in part:

## 1. AGENT'S AUTHORITY

A. The Agent is an independent contractor will exercise his own judgment in the conduct of his business. The Agent is not an employee of the Company and is free to represent such other companies as the Agent shall consider appropriate. He has exclusive control of his time and of the conduct of his agency and he is responsible for all expenses incurred in the operation of his agency.

B. During the term of this agreement, the Agent is authorized on behalf of the Company:

6. To bind coverage and execute insurance contracts in accordance with the guidelines furnished from time to time by the Company or as authorized by the Company with respect to specific risks.

C. The Agent agrees to forward copies of all policies, fidelity and surety bonds, certificates and binders issued by the Agent or otherwise notify the Company in writing of all liability accepted, not later than the seventh day following the inception date of coverage or the date of acceptance of coverage, whichever occurs first.

22. Woods did not notify Reliance in writing that umbrella coverage was bound within seven days of the inception of the coverage on May 27, 1981. She did orally notify them immediately after the loss (See, *supra*, Findings of Fact # 13).

23. Had notice been given to Reliance, they would have written the umbrella coverage. Shelby had an excellent safety record. McComas accepted the entire Shelby account, and would have written the umbrella coverage if the application of May 6, 1981 (Reliance # 6) had not been limited to a quote.[1]

---

1. McComas testified that if such application had been made he might have exercised other alternatives and that he would have ordered a survey. The record shows, however, that he wrote two million dollars umbrella coverage after Shelby experienced the May 27, 1981 loss and

## CONCLUSIONS OF LAW

### I. EXTENT OF RELIANCE'S LIABILITY.

The primary issues before us are whether Reliance—Shelby's insurer—provided coverage for property damage in this case, and if so, the limits of that coverage. Shelby alleges that Reliance provided $100,000 in property damage insurance, plus umbrella coverage in the amount of $1 million. We agree.

#### a. THE PRIMARY POLICY

The May 13, 1985 binder covered Shelby's loss until the comprehensive general liability policy was written on June 1, 1981, with a retroactive effective date of May 27, 1981. (SCC # 1). This policy provides the terms and conditions of the insurance contract on the date of the accident.

The policy provides comprehensive general liability coverage to Shelby, as follows:

"I. COVERAGE A–BODILY INJURY LIABILITY
COVERAGE B–PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or
Coverage B. property damage

to which this insurance applies, caused by an occurrence ..."

(SCC # 1 at 20a). Thus Reliance has contracted to pay on behalf of Shelby all property damage for which Shelby may be liable on account of the occurrence (explosion) of May 27, 1981 unless Reliance can prove that such payment is excused under one of the exclusions in the policy.

Reliance urges that since Shelby's operations are described in the policy as "grading of land" (SCC # 1 at 21, 22) and the

---

that in doing so he did not order a survey. We find that the umbrella coverage was part of Woods' original Shelby package. When later she learned that Texas and Louisiana rates were comparable, the cost ceased to be a problem.

application R3 did not request underground "u" coverage, that the occurrence of May 27, 1981 is excluded under the following language of the policy: [2]

EXCLUSIONS

This insurance does not apply:

\*    \*    \*    \*    \*    \*

(q) to property damage included within:

(1) the explosion hazard in connection with operations identified in this policy by a classification code number which includes the symbol "x",

(2) the collapse hazard in connection with operations identified in this policy by a classification code number which includes the symbol "c",

(3) the underground property damage hazard in connection with operations identified in this policy by a classification code number which includes the symbol "u".

■ We find no exclusion for any of three alternative reasons:

*First:* Coverage is determined by the terms and conditions of the policy. Ambiguities are construed in favor of the insured. Although the policy classifies Shelby's operations as "grading of land 07313 XCU", without underground coverage, so that the exclusion above might apply (SCC #1 at 21), it also classifies the operations as "grading of land 07313", with underground coverage, so that the stated exclusion would not apply (SCC #1 at 22). Construing the ambiguity against the insurance company, Reliance is liable on the face of the policy. This is the result intended by Mrs. Roberts who typed the T528 application.

*Second:* In the alternative, and should the above ambiguity be construed in favor of Reliance, the exclusion can apply only if, in fact, Shelby on May 27, 1981 was engaged in operations classified as "grading of land".

Without citation, it is well settled that the insurer bears the burden of proving that the exclusionary language contained in the policy is applicable. In this case, "grading of land" is listed in the description of operations but there is no definition of its meaning (SCC #1, at 37). This lack of definition is fatal to Reliance's defense. *Snell v. Stein,* 261 La. 358, 259 So.2d 876, 878 (1972). Further, the insurer has failed dismally to demonstrate Shelby was engaged in "grading of land" as that phrase is understood in the insurance industry. Not one witness at trial, including Reliance's witnesses McComas and Herrington (expert), has classified the operations of Shelby on May 27, 1981 as "grading of land".

Grading of land is a term of art in the construction business involving the leveling of soil to achieve a practical degree of inclination, such as to grade a road. Digging a hole to bury trash is not grading of land. These operations were not "grading of land" as classified in the policy issued June 1, 1981, and that therefore the exclusion attached to that classification (SCC #1 ¶ 1q(3) at 20) does not apply. Since Reliance has failed to establish the exclusion which it has plead, it has provided coverage in the amount of $100,000 for property damages caused by the puncture of the ammonia pipeline.

*Third:* In the alternative, it is hornbook insurance law that a binder merges into the subsequently issued policy so that the terms and conditions of the policy, in case of conflict or ambiguity, are controlling. In addition, the terms and conditions of the policy may be altered retroactively as Reliance did in this case at the request of Woods. On June 9, 1981 Reliance issued an endorsement retroactive to May 27, 1981 to include under the description of Shelby operations "oil lease work by contractor—not lease operations." According to all of Reliance's witnesses, including its expert Herrington, this classification includes un-

---

**2.** Shelby's operations are also identified in the policy by another classification code number employing the symbol "U"—street and road construction—1615XCU. (SCC #1 at 21). Reliance

does not urge that Shelby was engaged in this type of work in its post-trial memorandum. This claim is considered abandoned and does not warrant further discussion.

derground coverage and was the correct classification necessary to cover Shelby's operations on May 27, 1981. Thus Reliance is obviously liable for $100,000 property damage coverage under the endorsed policy.

### b. THE UMBRELLA POLICY

Woods was retained by Pouyer to acquire the insurance coverage necessary for Shelby to conduct its business in Texas and Louisiana. Shelby was attracted to Woods since she possessed binding authority from several insurance companies and could issue certificates faster than its current agent. She was also expert in her field. Pouyer did not know what type or amount of coverage was appropriate, mentioned neither and left these matters entirely up to Woods. There is no dispute that the type as well as the amount of insurance coverage to be acquired by Wood for Shelby was entirely at Woods' discretion.

Woods' agency contract with Reliance gave her absolute power to issue oral or written binders. All Reliance witnesses including McComas, its underwriter, Legendre, an officer, and Herrington, its expert, agree that she possessed this authority and that the validity of her binder to any insured would not be reduced or affected by her failure to give notice of such binder to Reliance.

■ Reliance's principal contention is that there was no contract: there was no meeting of the minds because Woods had not given notice of the umbrella binder to Shelby and had not given the required notice to Reliance prior to May 27, 1981. We find that there was no contractual dispute because the absolute character of Woods' authority from each did not require notice to either party. The uncontraverted evidence is that Woods had absolute authority from Shelby to buy the coverage she thought necessary and appropriate to Shelby's operations. As testified to by Reliance witnesses Mr. Comas, Legendre and Herrington, Reliance was bound the minute Woods made the oral binder. What better evidence of the contract can there be?

Both parties, in the person of their common agent, Woods, agree that an oral binder for umbrella coverage was made. Reliance cannot disclaim the action of its agent. Reliance clothed her with this authority. For the purposes of this contract, Woods is Shelby and Woods is Reliance. She is Reliance just as much as McComas or Legendre. Reliance, through Woods, has represented that Shelby had umbrella coverage by oral binder. Reliance is bound by the act of its agent. This is true even after the loss if Reliance does not believe her. This was not their attitude in the prior Lutesville coverage (Woods # 5). There was no loss in that instance and they were very happy to accept the premium on an identical oral binder.

### II. BROKER'S BREACH OF DUTY TO THE INSURER.

Reliance alleges that Woods failed to properly represent the classification of risks as "oil lease work by contractor", and her failure to do so renders her liable for any sums paid by Reliance under the primary policy.

■ However, Woods' negligence, if any, did not cause the loss sustained by Reliance, to-wit: $1.1 million, because the purported misclassification of the risk is immaterial to the issue of coverage. (See *supra*, Conclusions of Law 1a).

Reliance also alleges that Woods breached her agency agreement by failing to notify the insurer of umbrella coverage in writing within seven days.

■ We have already determined that Reliance would have issued the policy if the proper notice had been given. (See, *supra*, Findings of Fact 23). *Mathews v. Marquette Casualty Co.*, 152 So.2d 577 (La. App. 2nd Cir.1963). Reliance did in fact issue such umbrella coverage in the amount of $2 million shortly after the accident. Reliance has not proven that lack of notification of the umbrella coverage has caused any damage. *Id.*, at 584–85.

Considering the foregoing, Shelby is ordered to submit a judgment consistent with this Opinion within ten (10) days of date.