Larry BRISTER, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Bobby BRISTER, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Linda Gayle PESNELL

v.

GULF CENTRAL PIPELINE COMPANY, et al.

SUCCESSION OF J.O. GRIFFIN

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Edroe T. PESNELL, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Claude L. PESNELL, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al.

Mike GRIFFIN, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al. (Two Cases)

Raymond CALDWELL, et al.

v.

GULF CENTRAL PIPELINE COMPANY, et al. (Two Cases)

---

Hollis L. SPILLERS, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Vicki Janell GRIFFIN

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Harold L. PESNELL

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Jack FARMER, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Edroe T. PESNELL, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Randy BRISTER, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Pam FARMER, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

O.R. GRIFFIN, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

W.J. PESNELL, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Vannie M. GRIFFIN

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

T.S. PESNELL, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Mary W. SMITH

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

C.J. UNDERWOOD, et al.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Raymond S. CALDWELL, Jr.

v.

GULF CENTRAL PIPELINE
COMPANY, et al.

Civ. A. Nos. 82–1069 to 82–1089,
82–1380, 82–1437 and 82–1485.

United States District Court,
W.D. Louisiana,
Monroe Division.

April 28, 1988.

Robert E. Shadoin, Ruston, La., Charles D. Jones, Benjamin Jones, David E. Verlander, III, William G. Kelly, Jr., Monroe, La., for plaintiffs.

Joseph L. Hargrove, Jr., A.L. Wedgeworth, III, Scott C. Sinclair, Gordon E. Rountree, Dale G. Cox, Billy J. Guin, Jr., Shreveport, La., J. Bachman Lee, Monroe, La., John R. Smith, Center, Tex., for defendants.

## OPINION

NAUMAN S. SCOTT, District Judge.

This consolidated action arises out of an accident involving the rupture of a liquid ammonia pipeline located in a rural part of Jackson Parish near Cartwright, Louisiana. The accident occurred on May 27, 1981 when an employee of Shelby County Construction Services, Inc. ("Shelby County") struck and punctured the pipeline while operating a bulldozer. A large amount of anhydrous ammonia was vaporized, escaped into the atmosphere and settled over the surrounding area. Thereafter, residents and landowners from the area instituted 24 separate lawsuits in state court to recover damages for personal injuries and property losses allegedly caused by the ammonia. Named as defendants were: Gulf Central Pipeline Company ("Gulf Central"), the owner and operator of the ammonia pipeline; Mitchell Energy Corporation ("Mitchell Energy"), the owner of the oil, gas and mineral rights for the land where the accident occurred; Shelby County, the independent contractor hired by Mitchell Energy to clear the land and prepare it for use as an oil well site; and "any liability insurers which insured [these] companies." Plaintiffs' Original Petition for Damages. The three defendants removed the 24 suits to this Court and we ordered their consolidation for purposes of trial pursuant to Rule 42(a) of the Federal Rules of Civil Procedure. Each of the defendants has denied responsibility for the accident and has asserted a cross-claim against the other two for indemnity or contribution. Additionally, each of the three defendants has filed a cross-claim[1] against Reliance Insurance Co. ("Reliance"), the liability insurer of Shelby County. In its cross-claims, Gulf Central is not only seeking indemnity or contribution, but is also seeking damages for its costs to repair the pipeline and for its loss of ammonia product. Likewise, Mitchell Energy is also seeking in its cross-claims to recover $109,565.65 it has already paid in settlement to 47 nonparty residents and landowners. Gulf Central has also filed a third-party complaint against Crown–Zellerbach Corporation ("Crown–Zellerbach"), the owner of the land where the accident occurred.

---

1. In its cross-claim, Gulf Central named Reliance Insurance Company, along with the original defendants, Mitchell Energy and Shelby County, as defendants on the cross-claim. At that time, Reliance had not been made a party to the action. Since a cross-claim may be filed only against a "co-party", Fed.R.Civ.P. 13(g), Gulf Central should have served Reliance with a summons and third-party complaint. Fed.R.Civ.P. 14(a). However, because Reliance answered the cross-claim and has never objected to the form of the pleading or the sufficiency of service, any such defense has been waived. Fed.R.Civ.P. 12(h).

Following a trial limited to the issue of insurance coverage, we held that at the time of the accident Reliance provided liability coverage to Shelby County with limits of $500,000 for bodily injury, $100,000 for property damage, and $1,000,000 in umbrella coverage. *Brister v. Gulf Central Pipeline Co.,* 618 F.Supp. 104 (W.D.La. 1985), *affirmed,* 788 F.2d 1564 (5th Cir. 1986). We also ordered the bifurcation of the remainder of this action and set the trial of the liability issues for May 18, 1987 and the trial of the damage issues for a later date. We now address the liability issues, specifically: (1) whether any or all of the original defendants, i.e., Gulf Central, Mitchell Energy, and/or Shelby County, are liable to plaintiffs for damages caused by the ammonia gas; (2) whether Gulf Central, Mitchell Energy, Shelby County and/or Reliance are entitled to recover on their cross-claims; and (3) whether Gulf Central is entitled to recover on its third-party claim against Crown–Zellerbach.

## FINDINGS OF FACT

1. Plaintiffs are residents and/or landowners near Cartwright, Louisiana and are citizens of Louisiana.

2. Defendants Gulf Central, Mitchell Energy, Crown–Zellerbach, Shelby County and Reliance are foreign corporations which have their principal places of business in states other than Louisiana.

3. At all times pertinent to this action Crown–Zellerbach was owner of the land where the pipeline rupture occurred; Gulf Central was owner of a right-of-way across Crown Zellerbach's land and was owner and operator of the ammonia pipeline; Mitchell Energy owned the lessee's interest in an oil, gas and mineral lease covering the same land; Shelby County was an independent contractor hired by Mitchell Energy to clear the land and prepare it for use as an oil well site; and Reliance was Shelby County's liability insurer.

4. Gulf Central uses its pipeline to transport anhydrous ammonia from chemical plants in Louisiana to storage facilities in the midwest. (Exhibit M–16, Gulf Cen-

tral System Map). The segment of pipeline that runs through Jackson Parish is 10 inches in diameter. The right-of-way across Crown–Zellerbach's land is 30 feet wide—15 feet on either side of the pipe. (Exhibit R–24, Right-of-way Easement; Dep. Tr. of William M. Kyger at 8).

5. In April, 1981 Mitchell Energy requested that Marvin T. Kent and Associates conduct a land survey of the subject oil well site which was located in the northeast corner of Section 16, Township 17 North, Range 1 West, Jackson Parish, Louisiana. During the survey, the surveyor observed that the well location was 195 feet from the ammonia pipeline right-of-way. (Dep. Tr. of Marvin Thomas Kent at 32). After the survey was made, Marvin Kent prepared a plat showing the well location and gave this plat to Mitchell Energy. (Exhibit R–19, Kent # 2). The plat incorrectly indicates that Gulf Central's pipeline runs southeast of the well location; the pipeline actually runs southwest of the well.

6. On or about May 19, 1987 Mitchell Energy received a title opinion which was prepared by attorney Joseph L. Hargrove, Jr. (Exhibit R–13, Title Opinion of May 14, 1981). In Comment 13 of the title opinion Hargrove pointed out the existence of a pipeline right-of-way instrument granted to Gulf Central affecting the subject land. Hargrove further stated: "We, of course, recommend and require that you conduct all of your operations on the land under examination with due regard for the rights accorded the grantee under these instruments." (Exhibit R–13 at 7; *see also* Uncontested Facts No. K, Pretrial Stipulations filed May 4, 1987).

7. In early May, 1981 Mitchell Energy invited Shelby County to submit a bid proposal to excavate and clear land at the well site. Before preparing its bid, Shelby County's president, Joe Pouyer, met with a Mitchell Energy representative at the well site and inspected the surrounding land. During the meeting there was no specific discussion regarding the close proximity of Gulf Central's ammonia pipeline, however, Pouyer did observe two markers or signs

indicating the presence of an underground pipeline. (1st Dep.Tr. of Joseph E. Pouyer at 28–29, 41–43; 2nd Dep.Tr. of Joseph E. Pouyer at 56–57). The signs were positioned on opposite sides of a gravel road that was adjacent to and north of the well site. Pouyer aligned the two sign posts and concluded that the path of the pipeline would not cross the well site area. (Pouyer #1, *supra* at 43–44; Pouyer #2, *supra* at 57–58). Mitchell Energy subsequently awarded the job to Shelby County as low bidder. The parties did not execute a written agreement. (Pouyer #1, *supra* at 27–28).

8. The topography of the land at the well site directly affected Shelby County's work. Crown–Zellerbach had clear-cut and harvested the timber on the land south of the gravel road in the vicinity of the well location in either 1975 or 1976. (Dep.Tr. of Gary W. Franklin at 15–16). Crown–Zellerbach used a helicopter to reseed the area with pine seedlings in 1977. *Id.* In May, 1981 this land was completely covered with grass, weeds, brush and young pine trees; the vegetation was between four and ten feet in height. (Dep.Tr. of Joe Parks at 32; Dep.Tr. of Levi Morgan Harris at 33–34; Franklin, *supra* at 14–17; Dep.Tr. of Bobby Brister at 10; Dep.Tr. of Frank Dykstra at 10, 12; Kent, *supra*, at 27; *see also* Exhibits R–11, R–12, R–16). In contrast, the land north of the gravel road was covered with tall pine trees except for a clearly defined strip of land running north-south, which was Gulf Central's right-of-way. (Harris, *supra* at 35; Exhibit R–11; Exhibit G–8). Also, utility high lines were located north of the site adjacent to the gravel road. (Parks, *supra* at 19–22; Harris, *supra* at 31). The land elevation west of the well location abruptly decreased near either a creek bed or bottom area. (Harris, *supra* at 29–30). The well site was bordered on the east by Gulf Central's right-of-way. The ground in the general vicinity was muddy and partially covered with garbage that had been previously dumped there. (Parks, *supra* at 17, 35; Harris, *supra* at 17–18).

9. In May, 1981 it was Gulf Central's company policy to mow its pipeline rights-of-way approximately every three or four years. The determination as to when a certain segment of right-of-way needed mowing was based upon field observation by employees and upon past experience. (Dep.Tr. of William M. Kyger at 8–9, 57; Dep.Tr. of John D. Platt at 9, 41–42). The right-of-way across Crown–Zellerbach's land south of the gravel road had not been mowed by Gulf Central since 1974 (Platt, *supra* at 6–7).

10. Gulf Central's right-of-way south of the gravel road was not identifiable.[2] Except for a gap in the timber line which could be seen approximately one-half to three-quarters of a mile in the distance, the land south of the road was completely covered with vegetation between four and ten feet high. (Finding of Fact No. 8; Harris, *supra* at 33–35; Parks, *supra* at 31–33).

11. Employees of Shelby County began working at the well site on or about May 18, 1981. Their work consisted of clearing vegetation from the site, leveling the land, constructing board road,[3] and digging various pits.

12. Prior to the time of the accident, Mitchell Energy did not warn Shelby County or its employees about the actual close proximity of the ammonia pipeline to the well site. (Harris, *supra* at 75; Pouyer #1, *supra* at 29, 43, 45; Stipulations of Fact No. N, Reliance Request for Production No. 2 filed June 4, 1987). The only written information regarding the preparation of the well site was a diagram of Paramount Drilling Rig No. 10 provided by

2. Gary Franklin, a forester employed with Crown–Zellerbach, testified that the area had been fully regenerated with pine trees and the pipeline right-of-way had not been bush-hogged or cleared. As an experienced forester, he found it difficult to distinguish where the right-of-way was. (Franklin, *supra* at 12–14. *See also Brister, supra* at 6).

3. Board road was necessary to support the drilling rig equipment since the ground was muddy. It was constructed by laying plastic on the ground and applying approximately three layers of 3' x 8" boards on top of the plastic, and then nailing the boards together. (Pouyer, *supra* at 30–31; Harris, *supra* at 18, 22).

Mitchell Energy (*See* Exhibit R–20 a.k.a. Harris Dep.Ex. No. 1; Pouyer # 1, *supra* at 29–30; Harris, *supra* at 7). This diagram simply indicated that the site needed to measure 300′ x 240′ to accommodate the Paramount rig and also showed the arrangement of the various pieces of rig equipment. No pipe line location was shown on the diagram.

13. Various employees of Shelby County testified that prior to the accident they were unable to tell for certain where the pipeline right-of-way was located south of the gravel road, however, they thought that they had a general idea where the right-of-way was. (Parks, *supra* at 16–19, 32–33; 36–39; Harris, *supra* at 33–36, 68–71; Turner, *supra* at 14–18, 24–26; Pouyer # 1, *supra* at 43–44). Linn Turner, a partner and general superintendent for Shelby County, had assumed that the right-of-way ran perpendicular to the gravel road due to the positions of the pipeline signs along the sides of the road. (Turner, *supra* at 17). Morgan Harris, another superintendent, and Joe Parks, an experienced bulldozer operator, thought they knew the general location of the right-of-way after positioning themselves near the pipeline signs and eyeballing a straight line southward toward a gap in the timber line approximately one-half to three-quarters of a mile away. (Harris, *supra* at 33–35; Parks, *supra* at 17–18, 31). The Shelby County employees were confident that their job would not require any excavation near the area where the right-of-way presumably was, and therefore, they determined that it wasn't necessary to telephone Gulf Central for assistance. (Pouyer # 2, *supra* at 75–76; Harris, *supra* at 83; Turner, *supra* at 16–17; Parks, *supra* at 16–19, 29).

14. In May, 1981 it was Shelby County's company policy to contact pipeline and utility owners whenever it was necessary to locate underground lines. (Pouyer # 2, *supra* at 17, 75–76; Parks, *supra* at 27–29; Harris, *supra* at 82–83).

15. In May, 1981 Mitchell Energy employed Frank Dykstra as a consultant to supervise the drilling operations of Paramount Drilling Company. At that time Paramount was drilling an oil well at a location several miles or more from the subject well site which Shelby County was preparing. Dykstra visited the subject well site on a daily basis in order to check on the progress of the work by Shelby County. (Dep.Tr. of Frank Dykstra at 30). Shortly after Shelby County's employees began working at the site, Dykstra and a tool pusher employed by Paramount met at the site with Morgan Harris. (Dykstra, *supra* at 6–8; Harris, *supra* at 80). Harris was concerned that the well site was a "tight location" due to the low clearance from the highwire lines, the low ground level near the creek bed, and the presence of the pipeline, and he wanted to know how to rotate the position of the board road in order to accommodate the Paramount drilling rig. (Harris, *supra* at 28–32, 73–75: Dykstra, *supra* at 6–7). Dykstra and the Paramount tool pusher set stakes in the ground at the four corners of the area that needed to be boarded. Dykstra testified that he "stepped off" the distances between the stakes and that the Shelby County supervisor [Harris] "didn't have a thing to do with where to put [the stakes]." (Dykstra, *supra* at 20; Harris, *supra* at 58, 73–75).

16. Dykstra thought that the pipeline right-of-way was located a sufficient distance east of the area which Shelby County needed to clear and cover with board road. (Dykstra, *supra* at 8–12). He made this determination after he positioned himself near the pipeline signs along the gravel road and visualized a straight line southward. *Id.* He concluded that the right-of-way was "far enough away" and therefore it was not necessary to contact anyone about the pipeline.[4] *Id.* at 28–29. Furthermore, Dykstra did not consider it part of his job responsibility as a consultant for Mitchell Energy to notify Gulf Central

---

4. Dykstra testified that "there was plenty of room for our location without bothering their pipeline except it turned and we didn't know it turned.... We never gave the pipeline another thought." (Dykstra, *supra* at 9).

about the work occurring close to the pipeline. *Id.* at 29.

17. At a point approximately 270 feet south of the gravel road, Gulf Central's 10-inch pipeline bends 10°30' to the west (toward the well site).[5] (Uncontested Facts No. L, Pretrial Stipulations filed May 4, 1987; Exhibit G–7, Alignment Sheet; Kyger, *supra* at 69–70).

18. Dykstra admitted that Shelby County properly constructed the board road relative to the stakes that were set. (Dykstra, *supra* at 8). A corner portion of the board road extended approximately 10 feet onto Gulf Central's right-of-way. (Dykstra, *supra* at 13, 19; Kyger, *supra* at 62).

19. Prior to the accident, Gulf Central was not aware that Mitchell Energy and Shelby County were working near the pipeline right-of-way south of the gravel road. (Platt, *supra* at 10).

20. Prior to the accident, three individuals warned employees of Shelby County about the close proximity of the ammonia pipeline to the well site. Gary Franklin, an employee of Crown–Zellerbach, spoke with a Shelby County employee on May 10, 1981 and cautioned him about excavating the land in that vicinity due to the presence of the pipeline. (Franklin, *supra* at 608). Bobby Brister and Lawrence Leroy Metcalf, residents living close by the area, had similar conversations with Shelby County

workers prior to the pipeline rupture. (Brister, *supra* at 4–8; Dep.Tr. of Lawrence Leroy Metcalf at 4–7).

21. On the morning of May 27, 1981 the Shelby County employees had almost completed their work at the well site. Linn Turner instructed Ken McAdams, a bulldozer operator who is now deceased, to dig a pit a short distance south of the board road and bury trash that was on the site. (Turner, *supra* at 20–25; Harris, *supra* at 62–63). Turner had assumed that the pipeline right-of-way was a safe distance east of the pit area. (Turner, *supra* at 24). At approximately 12:15 P.M. McAdams punctured the pipeline with the bulldozer while digging the trash pit a short distance from the board road. (Uncontested Facts No. H, Pretrial Stipulations filed May 4, 1987; Harris, *supra* at 62–63). The puncture of the pipeline occurred approximately 325 feet south of the gravel road. (Uncontested Facts No. L filed June 4, 1987; Kyger, *supra* at 78). The puncture created a hole which was 2½" x 8". (Kyger, *supra* at 24).

22. After receiving notification of the pipeline rupture from Shelby County, Gulf Central immediately began taking emergency action to isolate the segment of pipeline where the rupture occurred so that repairs could be initiated. Gulf Central's dispatcher in Tulsa, Oklahoma had the capability to actuate certain automatic shutdown valves throughout the transmission

---

**5.** William Kyger, Gulf Central's district superintendent in Louisiana and Arkansas at the time of the accident, testified regarding the bend in the pipeline:

Q: Do you know if that pipeline makes any jag after it crosses that gravel road from the north side to the south side, in either direction, or in any direction?
A: There's a what we call a PI, which is point of intersection of two survey lines. In other words, if you are going down your pipeline this away and you drive a stake, and you go down your pipeline this away and you drive a stake, where those two stake lines intersect, that's your PI, point of intersection. It means that there's a bend in the pipe, not necessarily under this PI stake, but inside the diameter of that curvature is where the top of the pipe is. The PI is very seldom right on top of the pipe, unless you had a miter joint. That's a no-no in pipeline construction. You don't have any mitered pipe joints.
Q: This PI is something—

A: PI is point of intersection.
Q: Is that depicted by a sign or marker of some type on top of the ground?
A: Not always. Now, when it's surveyed, when it's first surveyed it is, and on your alignment sheets, you'll see a PI certain degree to the right or to the left, at station number such and such, you know.
Q: But the layman who is on the ground—
A: *But the layman walking along the pipeline, he knows that pipeline has turned to the right.*
Q: *How does he know that?*
A: *Because the right-of-way, itself, is cut up to this point and cut around this curve to go on yonder.* So he knows that that pipeline makes a PI to the right; exactly where he doesn't know. He can't take a probe bar and hit it within five feet.
Q: *So the right-of-way is the only guideline that the layman has?*
A: *Uh-huh.*
(Kyger, *supra* at 69–70 (emphasis added)).

system by pushing remote control switches. (Kyger, *supra* at 14–16). The dispatcher attempted to close an automatic shutdown valve at the Chatham, Louisiana pump station, which was located approximately seven miles south (upstream) of the rupture site. However, the valve failed to close completely and it allowed additional ammonia product to flow into the ruptured segment. (Kyger, *supra* at 15–17, 84; Platt, *supra* at 21–24). The valve was manually closed by a Gulf Central employee later that same afternoon. *Id.* The exact sequence of other action taken by Gulf Central is unclear. At 12:26 P.M. ammonia product was still flowing through the pipeline north (downstream) of the rupture. At some time thereafter the Tulsa dispatcher closed the automatic shutdown valve at the Spearsville, Louisiana pump station, which was located approximately 38 miles north of the rupture site. A block valve on an incoming 4–inch pipeline from Sterlington, Louisiana, which is located approximately 32 miles north of the rupture site, was also manually closed. (Kyger, supra at 15–19, 87–93). Additionally, at 12:45 P.M. a Gulf Central employee manually closed a block valve located just north of the rupture site. (Platt, *supra* at 19–20; Kyger, *supra* at 19–20; Dep.Tr. of John E. Cuck at 6–7).

23. In order to minimize the loss of ammonia at the rupture site, Gulf Central should have acted according to the following procedure:

(1) Close the automatic shutdown valve upstream of the rupture site (at Chatham, Louisiana pump station) and continue to pump product at the downstream pump station (Spearsville, Louisiana) in order to relieve pressure in the ruptured segment.

(2) Close the manually operated valve on the injection line downstream of the rupture site (near Sterlington, Louisiana) to prevent additional product from entering the pipeline.

(3) Allow the upstream pump station (Spearsville, Louisiana) to eventually

shut down automatically due to low suction pressure.

(4) Close manually operated valve just north of the rupture site (Valve 18).

(Exhibit R–21, Gulf Central's Operation Policy and Procedure Manual § 6.4.1; Kyger, *supra* at 13, 83–87; Platt, *supra* at 43–44; Cuck, *supra* at 7–9).

24. Beginning at 4:00 P.M. on May 27, Gulf Central began burning ammonia trapped in the isolated segment of pipeline. The burning process burned the vast majority of ammonia vapors that were being flared. Approximately 2½ days later, on May 30, 1981, the pressure inside the isolated segment was low enough to allow the pipeline to be repaired. Gulf Central's employees bolted a "T"-clamp over the hole as a temporary repair measure. Gulf Central began pumping ammonia product through the pipeline at reduced pressure that night. On May 31 Gulf Central discovered that the clamp was allowing ammonia vapor to leak out of the pipeline, and its employees remedied this by welding the "T"-clamp to the pipe. (*See* Platt, *supra* at 25–33, 44–47; Kyger, *supra* at 20–26).

25. On June 10, 1981 Gulf Central initiated permanent repairs to the pipeline. Gulf Central's employees utilized stoppling equipment to isolate a 16–foot segment of the pipeline and to vent the ammonia vapor trapped in this segment directly to the atmosphere. They then cut out approximately 7½ feet of the pipe and replaced it. (Platt, *supra* at 36, 50–53; Kyger, *supra* at 103–107).

26. The stoppling equipment and procedure was not utilized on or before May 30, 1981, instead of the temporary repair procedure, because the only set of stoppling "T's" for 10–inch pipe which Gulf Central owned were being used at that time in either Arkansas or Missouri. Had 10–inch stoppling equipment been available when needed, Gulf Central could have used it in conjunction with other action already taken in order to permanently repair the pipeline on or before May 30, 1987.[6] (Platt, *supra* 54–56; Kyger, *supra* at 107–123).

---

**6.** William Kyger testified that had the stoppling

equipment initially been available for use, he

27. At the time of the accident, Shelby County Construction Services, Inc. was a corporation authorized under the laws of the State of Texas and doing business thereunder. On March 26, 1982 the corporate name was changed to Petro Site, Inc. Thereafter, on March 9, 1983, Petro Site, Inc. was involuntarily dissolved by the Texas Secretary of State. (Exhibit R–22, Certificates from the Secretary of State of the State of Texas).

## CONCLUSIONS OF LAW

We have jurisdiction in this case. 28 U.S.C. § 1332. Plaintiffs contend that Gulf Central, Mitchell Energy, and Shelby County are liable *in solido* for their damages under theories of negligence and strict liability. We address the liability of each defendant separately.

### A. GULF CENTRAL'S LIABILITY.

1. *Liability for Negligence.* Louisiana courts employ a "duty-risk" analysis in negligence actions to determine whether, under the facts of the case, liability exists pursuant to Louisiana Civil Code articles 2315 and 2316.[7] *Mart v. Hill,* 505 So.2d 1120 (La.1987); *Forest v. State of Louisiana, through the La. Dept. of Transportation & Development,* 493 So.2d 563 (La. 1986); *Hill v. Lundin & Associates, Inc.,* 260 La. 542, 256 So.2d 620 (1972); *Dixie Drive–It–Yourself System, Inc. v. American Beverage Co.,* 242 La. 471, 137 So.2d 298 (1962). *See also Andrus v. Trailers Unlimited,* 647 F.2d 556 (5th Cir.1981); Crowe, *The Anatomy of a Tort—Greenian, as Interpreted by Crowe, Who Has Been Influenced by Malone—a Primer,* 22 Loyola L. Rev. 903 (1976). Under this analysis, a plaintiff must prove by a preponderance of the evidence that:

(1) Defendant's conduct was a cause-in-fact of plaintiff's harm;

(2) Defendant owed plaintiff a legal duty which encompassed the particular risk of harm to which plaintiff was exposed;

(3) Defendant breached the duty with respect to plaintiff, i.e. defendant acted unreasonably; and

(4) Damages were sustained.

Therefore, we apply a duty-risk analysis to the facts of this case to determine whether Gulf Central is liable to plaintiffs for negligence.

Gulf Central's failure to identify its pipeline right-of-way was a substantial factor that contributed to plaintiffs' harm. Except for a gap in the timberline in the distance, the area south of the gravel road was completely covered with small pine trees and vegetation. Gulf Central's pipeline right-of-way was not recognizable. Shelby County's employees, Mitchell Energy's consultant, as well as a forester employed by Crown–Zellerbach, all had difficulty determining what they assumed was the straight-line path of the pipeline. The inaccurate determination of the pipeline's precise location was a major cause of the rupture by Shelby County's employee. Gulf Central's failure to adequately identify its pipeline right-of-way by use of markers or by clearing and mowing the vegetation, so that third persons using the surface could reasonably determine the pipeline's location, was a contributing cause of the accident.

Gulf Central contends that Shelby County's failure to inform itself of the exact location of the pipeline was the sole and proximate cause of the accident. We disagree. "There can be more than one cause-in-fact of an accident as long as each cause bears a proximate relation to the harm which occurs and it is substantial in nature." *Nix v. Brasly,* 489 So.2d 1038, 1041 (La.App. 1st Cir.1986) (citing *Bodoin v. Daigle,* 452 So.2d 828 (La.App. 3rd Cir.), *writ denied,* 458 So.2d 485 (La.1984)).

would have used it in combination with the venting measures actually employed in order to permanently repair the pipeline. (Kyger, *supra* at 120–21).

**7.** La.Civ. Code Ann. art. 2315 (West Supp.1988) provides in part: "Every act whatever of man

that causes damage to another obliges him by whose fault it happened to repair it...."

La.Civ. Code Ann. art. 2316 (West 1979) provides: "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

"The causal relation inquiry does not require a search for all causes that contribute to the injury or for the single cause or for the 'proximate' cause. Causal relation is essentially a factual concept that requires a determination of whether the defendant's conduct was a substantial factor contributing to the plaintiff's harm." *Andrus v. Trailers Unlimited, supra* at 558. *See also Lombard v. Sewerage & Water Board of New Orleans*, 284 So.2d 905, 913 (La.1973); *Dixie Drive–It–Yourself System v. American Beverage Co., supra* at 302. We have no difficulty finding that Gulf Central's conduct was a substantial factor in bringing about the accident. "When the actionable negligence of two tort-feasors contributes in causing harm to a third party, each of them is responsible for the damage. They are solidarily liable." *Dixie Drive–It–Yourself System*, 137 So.2d at 301 (footnote omitted). *See also* La.C.C. art. 2324.

We next turn to the bifurcated inquiry: Whether the defendant owed a duty of care to plaintiffs, and whether the risk of injury sustained by plaintiffs falls within the ambit of that duty. Under Louisiana law, the owner and operator of a facility, such as a pipeline, must exercise at least reasonable care for the safety of persons both on and around its property. *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 239 (5th Cir.1983); *Walker v. Union Oil Mill, Inc.*, 369 So.2d 1043, 1047 (La.1979). "In determining a particular defendant's duty, consideration should be given to the nature of the facility and the dangers presented by it." *Id.* at 1047; *see also Owen, supra* at 239. The degree of care owed to others increases in relation to the inherent danger. *Wiggins v. Arkansas, Louisiana Gas Co.*, 441 So.2d 803, 806 (La.App. 2d Cir.1983); *Mobley v. Rego Co.*,

412 So.2d 1143, 1152 (La.App. 2d Cir.), *cert. denied*, 414 So.2d 774, 1251 (La.1982). Those who deal in or handle dangerous substances or agencies such as explosives, electricity, gas, firearms, combustibles, and fireworks are held to an *extraordinary* degree of care. *Winans v. Rockwell Int'l Corp.*, 705 F.2d 1449, 1454 (5th Cir.1983); *Mobley, supra* at 1152; *Miller v. Lambert*, 380 So.2d 695, 698 (La.App. 4th Cir.1980). *Compare Wiggins*, 441 So.2d at 806 (natural gas); *Kalmn, Inc. v. Empiregas Corp.*, 406 So.2d 276, 279 (La.App. 3rd Cir.1981) ("Those who handle and distribute [natural gas] are charged with the duty to exercise that degree of care commensurate with its dangerous character and necessary to protect the public from any foreseeable injury therefrom"). Anhydrous ammonia has been classified as a hazardous liquid by the federal government, 49 U.S.C.App. § 2001; 49 C.F.R. § 195.2.[8] It has been considered an inherently dangerous substance by the State of Louisiana. La.R.S. §§ 3:1351–1357; 36:409; 40:1841. *See also Plantation Anhydrous Ammonia Corp. v. Anhydrous Ammonia Comm.*, 234 La. 869, 101 So.2d 699, 701 (1958) ("The language of the statute [R.S. 3:1351–1357] leaves no doubt that in its enactment the Legislature was concerned primarily with public safety in the handling and distribution of this dangerously explosive product"). Accordingly, we find that Gulf Central, as an owner of an underground anhydrous ammonia pipeline, owed a duty of extraordinary care to conduct its operations in a manner so that the public would be protected from any foreseeable injury. Included within this duty is the duty to mark and maintain its pipeline right-of-way so that adequate warning of the pipeline's location is given to persons on the surface. *Owen v. Kerr–McGee Corp., supra* at 239. *See* 49 C.F.R. §§ 195.410, 195.412.[9] Even were we to

---

**8.** 49 C.F.R. § 195.2 (1987) provides:
Definitions.
    As used in this part—... *"Hazardous liquid"* means petroleum, petroleum products, or anhydrous ammonia.

**9.** 49 C.F.R. § 195.410 (1987) provides in part:
(a) ... [E]ach operator shall place and maintain line markers over each buried pipeline in accordance with the following:

(1) Markers must be located at each public road crossing, at each railroad crossing, and in sufficient number along the remainder of each buried line so that its location is accurately known....
(c) Each operator shall provide line marking at locations where the line is above ground in areas that are accessible to the public.
49 C.F.R. § 195.412 (1987) provides in part:

find that no such duty is imposed by law, we nevertheless would find that Gulf Central voluntarily undertook a similar duty. *Sowell v. United States,* 835 F.2d 1133 (5th Cir.1988); *Travelers Ins. v. Ragan,* 202 So.2d 302 (La.App. 1st Cir.1967). Gulf Central took measures to mark and maintain its pipeline right-of-ways pursuant to its own company policy, and would mow its right-of-ways approximately every three or four years. *See* Finding of Fact No. 9.

The risk of injury that befell plaintiffs is clearly included within the scope of Gulf Central's duty. The rule requiring a pipeline owner to properly identify the location of its underground pipeline is intended to prevent third persons from accidentally damaging the pipeline and thereby causing its contents to be released into the surrounding environment. This is particularly true where, as in this case, the pipeline contains a hazardous substance. The rule contemplates the protection of both people and property from an accidental discharge from the pipeline. Thus, the plaintiffs' injuries here are directly associated with Gulf Central's duty of care.

█ We have no difficulty finding that Gulf Central breached its duty to properly identify its pipeline right-of-way. Although it placed markers along both sides of the gravel road, those markers were inadequate for determining the path of the pipeline. The right-of-way was completely covered with small pine trees and other vegetation, and had not been mowed for five years or more before the accident. There was no indication to persons on the surface that the pipeline angled to the southwest. By aligning features that were present—the two markers near the road, the right-of-way north of the road, and the gap in the timberline to the south—Shelby County's employees and Mitchell Energy's consultant made the incorrect assumption that the pipeline ran in a straight line southward. Had Gulf Central provided additional markers or properly cleared and maintained its right-of-way, the location of

(a) Each operator shall, at intervals not exceeding three weeks, but at least 26 times each calendar year, inspect the surface condi-

the pipeline would have been readily apparent. Its failure to do so was unreasonable under the circumstances, and thus constituted negligence.

2. *Strict Liability Under La.C.C. Arts. 667 and 2317.* In addition to their negligence claim, plaintiffs also assert that Gulf Central is strictly liable for plaintiffs' damages under La.C.C. arts. 667 and 2317.

La.C.C.Ann. art. 667 (West 1980) provides:

Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.

"Article 667 espouses a doctrine of strict liability which does not depend upon negligence." *Bodoin v. Daigle, supra* at 831 (citing *Hero Lands Co. v. Texaco, Inc.,* 310 So.2d 93 (La.1975)). In *Hero Lands, supra,* the Louisiana Supreme Court stated:

As expressed in [Article 667], the principle is a limitation the law imposes upon the rights of proprietors in the use of their property. It is a species of legal servitude in favor of neighboring property, an expression of the principle of *sic utere.* An activity, then, which causes damage to a neighbor's property obliges the actor to repair the damage, even though his actions are prudent by usual standards. It is not the manner in which the activity is carried on which is significant; it is the fact that the activity causes damage to a neighbor which is relevant. *Chaney v. Travelers Ins. Company,* 259 La. 1, 249 So.2d 181 (1971). The article expresses, as this Court has often stated, a doctrine of strict liability which does not depend upon deliction.

*Hero Lands,* 310 So.2d at 97 (citations omitted).

█ Therefore, Article 667 fixes the responsibility of a proprietor to his neighbor, and Gulf Central is a proprietor and plaintiffs are neighbors within the contempla-

tions on or adjacent to each pipeline right-of-way.

tion of the article. *Id.* at 97. *Lombard v. Sewerage & Water Board of New Orleans, supra* at 914; *Chaney v. Travelers Ins. Company,* 259 La. 1, 249 So.2d 181, 186 (1971); *Langlois v. Allied Chemical Corp.,* 258 La. 1067, 249 So.2d 133, 138 (1971). *See also Yiannapoulos,* 4 La.Civ. Law Treatise § 44 (1983) ("By virtue of an expansive interpretation, any person assuming the position of owner, usufructuary, possessor in good or bad faith, or long term lessee, may qualify as proprietor. Moreover, the 'proprietor' may be liable not only for his acts but also for the acts of others, such as servants, guests, or lessees, either by virtue of directly applicable provisions of law or by virtue of a contractual relationship"). *Gulf Ins. Co. v. Employers Liability Assurance Corp.,* 170 So.2d 125, 129 (La.App. 4th Cir.1965) ("The word 'neighbor' as used in Article 667 is indefinite and refers to any landowner whose property may be damaged irrespective of the distance of his property may be from that of the proprietor whose work caused the damage").

■ Gulf Central, as a servitude owner, and thus a proprietor, was performing a work within its right-of-way which caused damage to the neighboring landowners. Accordingly, Gulf Central is strictly liable under La.C.C. art. 667 regardless of its prudence in maintaining the pipeline. *See Hero Lands Co. v. Texaco, Inc.,* 310 So.2d 93 (La.1975) (Owner of servitude for high pressure gas pipeline may be strictly liable for damages to neighbor under Article 667); *Smith v. Town of Logansport,* 395 So.2d 888 (La.App. 2d Cir.), *cert. denied,* 400 So.2d 1379 (La.1981) (Town held strictly liable under Articles 667 and 2317 for damages caused by ruptured waterline).

Plaintiffs also rely on La.C.C.Ann. art. 2317 (West 1979) which provides in part:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody....

Under this article the plaintiffs are required to prove that (1) The thing which caused the damage was in the care and custody of the defendant; (2) The thing had a vice or defect that created an unreasonable risk of injury; and (3) The vice or defect caused plaintiffs' injury. *Loescher v. Parr,* 324 So.2d 441 (La.1975); *Willis v. Cajun Electric Power Coop, Inc.,* 484 So. 2d 726 (La.App. 1st Cir.), *writ denied,* 488 So.2d 200 (La.1986). "Upon proof of these elements, the owner is responsible for the damages, unless he proves that the damage was caused by the fault of the victim, by the fault of a third person, or by an irresistable force." *Entrevia v. Hood,* 427 So. 2d 1146, 1148 (La.1983).

■ Here, the punctured pipeline was owned, operated and controlled by Gulf Central as part of its interstate pipeline system. The pipeline was layed underground and was completely hidden from view. Because of its concealed nature, and because it contained a hazardous liquid under high pressure, it posed a serious danger to users of the surface who did not have notice of the pipeline's location. The lack of signs or markers combined with the failure to maintain a recognizable right-of-way constituted a vice under the circumstances. *Travelers Indemnity Co. v. Exxon Pipeline Co.,* 449 So.2d 1074 (La.App. 1st Cir.), *writ denied,* 452 So.2d 179 (La. 1984) (Trial court found defendant's pipeline was defective due to failure to use signs or markers to indicate its location; unmarked gas pipeline created an unreasonable risk of harm to third persons). *Cf. Dupree v. Texas Eastern Corp.,* 639 F.Supp. 463 (M.D.La.1986). Because of the hazardous nature of anhydrous ammonia to individuals and property, this particular vice created an unreasonable risk of harm to plaintiffs and others. Gulf Central cannot rely on the argument that it is exculpated from liability due to the third-party fault of Shelby County. As we have already mentioned, any fault on the part of Shelby County was not the sole legal cause of the accident. *See also Olsen v. Shell Oil Co.,* 365 So.2d 1285, 1293–94 (La.1978) ("The fault of a 'third person' which exonerates a person from his own obligation importing strict liability ... is that which is the sole cause of the damage, of the nature

of an irresistable and unforeseeable occurrence—i.e., where the damage resulting has no causal relationship whatsoever to the fault of the owner...."); *Lang v. Prince,* 447 So.2d 1112 (La.App. 1st Cir.), *writ denied,* 450 So.2d 1309, 1311 (La. 1984).

Therefore, we hold that Gulf Central is also strictly liable to plaintiffs under La.C. C. art. 2317.

## B.  MITCHELL ENERGY'S LIABILITY.

■ 1. *Liability For Negligence.* Mitchell Energy does not deny that it did not determine the exact location of Gulf Central's pipeline in relation to its well site prior to instructing Shelby County to begin excavation work.  Rather, it argues that it was under no duty to ascertain the pipeline's exact location or to provide its independent contractor with that information—it credits that responsibility solely to Shelby County.  We are not convinced, however, and hold that under the circumstances, Mitchell Energy, as operator of the well site, owed a duty of reasonable care for the safety of persons on or around its facility. *Owen v. Kerr–McGee Corp., supra; Walker v. Union Oil Mill, Inc., supra.  Compare Edwards v. Jeems Bayou Production Co.,* 507 So.2d 11 (La.App. 2d Cir.1987) (mineral lessee that drills well has an obligation to act reasonably so as not to cause property damage).  Included within that duty is the obligation to take reasonable steps to locate and avoid underground pipelines on the premises. *See Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge,* 424 F.2d 684 (5th Cir.1970).  In *Transcontinental Gas Pipe Line* the owner of a submerged pipeline (TRANSCO) sued a lease operator (SIGNAL) and its drilling contractor (ODECO) for damage to its pipeline caused by the defendants' drilling operations.  In affirming the district

court's finding that the lease operator was concurrently negligent with its contractor, the Court of Appeals stated:

> [I]t is inconceivable to us that a lease operator can plan a drilling site in total disregard of the rights of owners of underground pipe lines.  All the pertinent information as to the existence and location of the lines was both in SIGNAL's hands and easily available as a matter of public information.  We need not decide to what extent a lease operator must go to fulfill its duties to innocent third parties like TRANSCO because SIGNAL took no steps whatever.  Even assuming the duty not to hit the pipe lines is delegable, SIGNAL did not delegate to ODECO in the Drilling and Rework Contract the responsibility of ascertaining the existence and location of submerged pipe lines.  SIGNAL did not even put ODECO on notice that it had made no check for the existence of underwater obstructions or submerged pipe lines.

*Id.* at 689.

Like the defendant lease operator in *Transcontinental Gas Pipe Line,* Mitchell Energy gained information concerning the existence and approximate location of Gulf Central's underground pipeline while planning its drilling site.  The selection of the site on Crown–Zellerbach's property was made by Mitchell Energy itself.  It requested that the land be surveyed by a registered land surveyor and that a title opinion be prepared by its attorney.  Thereafter, Mitchell Energy was placed on notice through the title opinion and the survey plat (albeit an incorrectly drawn plat) that Gulf Central's pipeline ran close to its well site.  In addition, prior to accepting bids for the site preparation work, a Mitchell Energy representative inspected the site and either saw or should have seen the two pipeline markers along side the gravel road.[10]  Mitchell Energy also knew or

---

**10.**  The telephone number for the pipeline company was printed on the markers; thus, it would have been relatively easy for Mitchell Energy to verify the location of the pipeline.

We also note that Mitchell Energy's mineral lease with Crown–Zellerbach called for Mitchell Energy to pay particular attention to the loca-

tion of pipelines on the property.  Paragraph 15 of the lease provides in part:

> *Liability of Lessee:* [Mitchell Energy] shall use due care to avoid damage to the property covered hereby, and to all timber, crops, wildlife, game, fish, animals, structures, facilities and improvements now or hereafter located

should have known that the pipeline carried anhydrous ammonia under high pressure and therefore any excavation near the pipeline posed a serious risk of harm to others. Under those circumstances, Mitchell Energy was required to exercise greater care commensurate with the danger, to protect the public from foreseeable injury. *Wiggins v. Arkansas Louisiana Gas Co., supra; Mobley v. Rego Co., supra; see also Pagitt Well Service, Inc. v. Sam Broussard, Inc.,* 293 So.2d 631, 635 (La.App. 3rd Cir.), *writ refused,* 295 So.2d 817 (La.1974). Its duty encompassed the risk that its excavation contractor might puncture the pipeline causing release of the anhydrous ammonia to the detriment of plaintiffs. Mitchell Energy took no steps to ascertain the exact location of the pipeline and convey that information to Shelby County. It should have taken those steps or at least instructed its contractor, Shelby County, that it must do so. Its failure to do either was negligent and was a substantial cause of the accident. Furthermore, the instruction given by Mitchell Energy's consultant, Frank Dykstra, to Shelby County regarding the location of the boundaries for the well site, constituted active negligence under the circumstances. The site was prepared consistent with Mr. Dykstra's instructions. The end result was that board road covering the site encroached ten feet into Gulf Central's right-of-way. When the pipeline was punctured, Shelby County's bulldozer operator was digging just a short distance from the edge of the board road.

■ 2. *Strict Liability Under La.C.C. Art. 667.* Mitchell Energy concedes that "it may have some liability under Article 667 as the mineral lessee." Mitchell Energy's Post–Trial Brief at 9–10. We agree that there is liability under Article 667.

■ As mineral lessee and operator of the well site, Mitchell Energy qualifies as a "proprietor" under Article 667. *Lombard v. Sewerage and Water Board of New Orleans, supra* at 914; *Borenstein v. Joseph Fein Caterers, Inc.,* 255 So.2d 800, 805–806 (La.App. 4th Cir.1972); *Yiannapoulas, supra* at §§ 44, 45. *See also Daigle v. Continental Oil Co.,* 277 F.Supp. 875 (W.D.La.1967); *Hilliard v. Shuff,* 260 La. 384, 256 So.2d 127 (1972); *Fontenot v. Magnolia Petroleum Co.* 227 La. 866, 80 So.2d 845 (1955). The excavation at the site was being performed at Mitchell Energy's request and for its benefit. It provided at least some supervision of the work through its drilling consultant. As in the case of Gulf Central, when the pipeline was punctured, it caused damage to plaintiffs for which Mitchell Energy is strictly liable under La.C.C. art. 667, regardless of its prudence in conducting operations at its well site.

## C. SHELBY COUNTY'S LIABILITY.

1. *Liability For Negligence.* As before, in the case of Gulf Central and Mitchell Energy, we examine the issue of Shelby County's liability for negligence under La. C.C. arts. 2315 and 2316 by applying a duty-risk analysis to the facts.

The evidence clearly establishes that Shelby County's conduct was a substantial factor contributing to plaintiffs' harm. Shelby County's employee caused the pipeline to be punctured while he was operating a bulldozer just south of the board road. Although Shelby County's employees were unable to determine by themselves where Gulf Central's pipeline was located, they knew of its existence and assumed that it ran perpendicular to the gravel road a short distance east of the well site. Generally speaking, we do not think it would be unreasonable for the average person to assume that an underground pipeline ran in

thereon, whether or not owned by [Crown Zellerbach]. [Mitchell Energy] will repair all ... pipelines, and other structures, facilities and improvements on such property which may be worn or damaged by any operation hereunder....

Paragraph 19 provides in part:

*Use of Premises:* It is understood by and between the parties that:

(a) ... Unless first consented to in writing by [Crown Zellerbach], no well shall be drilled nearer than two hundred (200) feet to any structure now or hereafter placed on the leased premises.

The location of Mitchell Energy's well was approximately 195 feet from Gulf Central's right-of-way. Finding of Fact No. 5, *supra.*

a straight-line path where the pipeline was located in a rural area and there were no pipe line markers or signs to indicate otherwise. However, in some circumstances, a party making such an assumption would be acting unreasonably. That is the situation we find before us involving Shelby County.

Shelby County was experienced in excavation work. It was familiar with working around underground pipelines and utilities and had developed a company policy to contact pipeline and utility owners whenever its employees were unsure about the location of such obstructions. Its employees, including its president, knew that Gulf Central's pipeline ran close by the well site and that the pipeline contained anhydrous ammonia. Shelby County employees had been warned by various individuals on three separate occasions that they were digging very near to the pipeline right-of-way and that they should exercise caution. Because of the pine trees and vegetation the employees were unable to tell for certain where the right-of-way was located.

Under these facts, Shelby County was required to exercise greater care in order to determine the location of the pipeline and avoid it.[11] "When confronted with a known hazard, particularly one of extreme proportions, one must exercise a degree of care commensurate with the circumstances. The greater the danger, the greater the degree of care that must be exercised when dealing with that danger." *Pagitt Well Service, supra* at 635 (citing *Culpepper v. Leonard Truck Lines,* 208 La. 1084, 24 So.2d 148 (1945)). The telephone number for the pipeline company appeared on its markers that were along-side the road. Therefore, it would have been relatively easy for someone with Shelby County to contact Gulf Central so the exact location of the pipeline could be flagged. Indeed, by its own company policy, Shelby County should have called the pipeline company.

■ Considering all the circumstances —i.e., the gravity of the harm should the anhydrous ammonia pipeline be damaged;

11. Gulf Central and Mitchell Energy urge us to apply *Southern Bell Telephone & Telegraph Co. v. Roy Cook & Sons, Inc.,* 218 So.2d 404 (La.App. 2d Cir.1969) and hold that under Louisiana law an excavator, such as Shelby County, has a positive duty to locate and avoid underground obstructions. We decline to make that our holding. *Southern Bell* is distinguishable on its facts. In that case the defendant damaged plaintiff's telephone cable while operating a bulldozer a short distance from an intersection and within the right-of-way of a public street. Several warning signs had been placed in the vicinity by plaintiff and defendant had been advised about the buried cable and its general location. Defendant had also been informed that the cable had been previously cut by another contractor. *Id.* at 407. In holding the defendant liable the court stated: *"Under the circumstances,* it was the positive duty of [defendant], before undertaking any excavation *within the right of way* of Aline Street, to inform himself as to whether telephone cables or other conduits of public utilities were below the ground to the end that he might avoid damaging such property." *Id.* (emphasis added). The court based its holding on a decision from another jurisdiction, *Illinois Bell Telephone Co. v. Chas. Ind. Co.,* 3 Ill.App.2d 258, 121 N.E.2d 600 (1954), and quoted from it as follows:

'... We are, ... of the opinion that when one like the defendant uses the public streets of a city for his own private purposes, and goes beneath the street surface by excavation or otherwise, the duty rests upon him to fully inform himself as to what lies below, so that he may avoid injury to the property of the city or others rightfully there. The streets of a modern city are so underlaid with pipes and conduits of various kinds necessary to the comfort and welfare of its citizens that one may be required to almost take judicial notice that in digging he may encounter some such pipe or conduit at any point in the street.' *Southern Bell, supra* at 407.

We think it is clear that the *Southern Bell* court limited its holding to the facts before it involving excavation in the right-of-way of a public street. However, we recognize the decision as persuasive authority for the proposition that under certain conditions an excavator may be required to exercise a greater degree of care to the public and the pipeline or utility owner, and determine the exact location of the underground obstruction. *Compare South Central Bell Telephone Co. v. Louisiana Power & Light Co.,* 501 So.2d 869 (La.App. 5th Cir.1987) (damages to underground cable during replacement of utility pole at intersection of highway and street); *South Central Bell Telephone Co. v. Southern Excavation, Inc.,* 401 So.2d 468 (La. App. 2d Cir.1981) (damage to underground cable during excavation in right-of-way of state highway within the city; location of cable had already been made known to defendant by plaintiff); *Home Insurance Co. of New York v. I.R. & G. Co.,* 50 So.2d 49 (La.App. 2d Cir.1950) (damage to underground pipeline caused by plaintiff's tractor; plaintiff knew exact location of the pipeline).

the likelihood of the harm given the close proximity of Shelby County's excavation to the "assumed" right-of-way; and the relative ease of avoiding the harm by determining the pipeline's exact location—we find that Shelby County acted unreasonably by knowingly taking a chance and by assuming the location and direction of the pipeline instead of determining its exact location. Such conduct was a breach of its duty of care to plaintiffs and to Gulf Central, and thus constituted negligence.

2. *Strict Liability Under La.C.C. Art. 667.* Article 667 imposes responsibility upon both the proprietor and his independent contractor who performs the work that causes the damage. *Olsen v. Shell Oil Co.,* 365 So.2d 1285, 1293 (La.1978); *Lombard v. Sewerage and Water Board of New Orleans, supra* at 914; *D'Albora v. Tulane University,* 274 So.2d 825, 828–29 (La.App. 4th Cir.1973). In *Chaney v. Travelers Ins. Co.,* 259 La. 1, 249 So.2d 181, 186 (1971), the court stated:

> And the proprietor is likewise responsible not only for his own activity, but also for that carried on by his agents, contractors and representatives with his consent and permission. This liability which the law imposes attaches also to the agent or contractor, who, as in this case, becomes solidarily liable with the proprietor if his activity causes damage to a neighbor.

■ Accordingly, we hold that Shelby County is solidarily liable with Mitchell Energy under La.C.C. art. 667 for causing damage to plaintiffs.

### D. APPORTIONMENT OF FAULT.

Having found defendants concurrently negligent and strictly liable,[12] and there-fore, solidarily liable to plaintiffs under La.C.C. art. 2324, we turn to the matter of apportioning fault among defendants. *See* La.C.C. arts. 2091 (1870) (current version of La.C.C. art. 1794 (1984)); 2103 (1979) (current version of La.C.C. art. 1804 (1984)); 2323. In determining the percentages of fault we are mindful of the Louisiana Supreme Court's guidelines for apportionment which are set forth in *Mart v. Hill,* 505 So.2d 1120, 1123–24 (La.1987) (citing *Watson v. State Farm Fire & Cas. Ins. Co.,* 469 So.2d 967 (La.1985) and *Turner v. New Orleans Public Service, Inc.,* 476 So. 2d 800 (La.1985)). For reasons we have assigned in parts A, B and C above, we apportion defendants' fault as follows:

| | |
|---|---|
| Gulf Central | 40% |
| Mitchell Energy | 35% |
| Shelby County | 25% |

### E. DEFENDANTS' CROSS–CLAIMS.

1. *Defendants' Claims for Contribution and Indemnity.* Gulf Central, Mitchell Energy and Shelby County/Reliance have each asserted cross-claims against the other two for tort indemnity or contribution.

The statutory basis for indemnification in Louisiana was formerly provided in La.C.C. art. 2106 but was amended and now appears in article 1804. The Comment to article 1804 explains that the law has not been changed by the amendment. Under either article, the result is the same— "[o]ne who is himself guilty of fault (negligence) is never entitled to indemnity." *Butler v. Intersouth Pipeline,* 655 F.Supp. 587 (M.D.La.1986).

■ The Louisiana Supreme Court addressed indemnification most recently in

---

12. Shelby County submits that even if it is found liable to plaintiffs, they are unable to obtain a judgment against Shelby County Construction Services, Inc. since it has been dissolved. This argument is without merit. Article 7.12 of the Texas Business Corporation Act provides in part:
  Survival of Remedy After Dissolution.
  A. The dissolution of a corporation ... by the issuance of a certificate of dissolution by the Secretary of State ... *shall not take away or impair any remedy available to or against such corporation,* its officers, directors or shareholders, for any right or claim existing,

or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within three years after the date of such dissolution. Any such action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name.
  *Id.* (emphasis added). *See also Temple–Eastex Corp. v. Addison Bank,* 672 S.W.2d 793 (Tex. 1984); *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547 (Tex.1981); *Thompson v. A.G. Nash & Company, Inc.,* 704 S.W.2d 822 (Tex.App. 12th Cir.1985).

*Dusenbery v. McMoRan Exploration Co.,* 458 So.2d 102 (La.1984). In that case the court stated:

> While both defendants are liable to the injured party, the defendant who is liable *only* as the owner of the unreasonably dangerous structure should be made whole by the defendant who actually caused the unreasonably dangerous condition for which the owner is strictly liable. As between the two defendants, ultimate responsibility rests with the party who was actually at fault, and the fact that the law imposed liability on the owner to the injured party does not detract from the owner's right to indemnification against the party who actually created the dangerous condition.
>
> 3. This is not to say that indemnity is available in every case in which there is one strict liability defendant and one negligent defendant. *Indemnity is available only when, as in the present case, the strict liability defendant is liable to the injured party on the basis of responsibility, imposed without proof of negligence, for an unreasonably dangerous condition which the negligent defendant actually created and which the strict liability defendant neither concurrently caused nor had an opportunity to actually discover and remedy.*

*Id.* at 105 & n. 3 (emphasis added). The United States Fifth Circuit Court of Appeals summarized Louisiana law of tort indemnity in *Diggs v. Hood,* 772 F.2d 190 (5th Cir.1985) as follows:

> Indemnity is due when fairness requires that one person bear the total responsibility for an injury. The basis for indemnity in the civil law, as in the common law, is restitution, the indemnitor having been unjustly enriched when the person seeking indemnity has discharged liability that was his responsibility. A solidary debtor who pays a debt that "concern[s] only" a co-debtor is, therefore, entitled to

indemnity from the debtor in whose behalf the debt arose. Thus a person who is held liable vicariously or passively for the tort of another is due indemnity from the culpable tortfeasor. *One who is himself at fault, however, is not due indemnity because liability for indemnity exists only when the party seeking indemnity, the indemnitee, is free of fault and has discharged a debt that should be paid wholly by the indemnitor.*

*Id.* at 193 (footnotes omitted; emphasis added). *See also* Schewe, *Debtors In Solido: On Plain Language and Uncertainty with Mention of the Revocatory Action,* 32 Loy.L.Rev. 13, 20–29 (1986). It is clear, therefore, that none of the defendants are entitled to indemnification since each has been found negligent.[13]

■ Turning to the defendants' contribution claims, we point out that we have already determined the division of the loss among the defendants as joint tortfeasors by applying the principle of proportionate fault (comparative contribution). Each defendant is liable for its virile portion which is proportionate to its fault. La.C.C. art. 2103 (1979) (current version at La.C.C. art. 1804 (1984)); art. 2104 (1870) (current version at La.C.C. art. 1829 (1984). "The right to contribution exists only in favor of a party who has paid what someone else owes." *Diggs v. Hood, supra* at 197. Unless there is a payment made by one of the obligors *in solido* which discharges all or part of the debt of the co-obligors from whom contribution is sought, there is no debt to be repaid and thus no liability for contribution. *Id.* *See* Schewe, *supra* at 17–19; Chamallas, *Comparative Fault and Multiple Party Litigation in Louisiana: A Sampling of the Problems,* 40 La.L.Rev. 373 (1980).

In its cross-claim Mitchell Energy contends that it has already paid $109,565.65 in settlement to 47 nonparty residents and

---

**13.** Even if defendants were non-negligent under the circumstances, they would still not be entitled to indemnification. We have held that each defendant is strictly liable for plaintiffs' damages and under *Dusenbery* indemnity is not al-

lowed where the strictly liable defendant concurrently caused the unreasonably dangerous condition and had an opportunity to actually discover and remedy the condition.

landowners, and in return has taken a conventional subrogation of their claims against Gulf Central and Shelby County. Therefore, Mitchell Energy claims it is owed contribution from Gulf Central and Shelby County for their portion of fault in causing those damages. We point out, however, that the issue of Mitchell Energy's right of contribution among defendants regarding those damages is not properly before us. Mitchell Energy has produced no evidence showing us that it is legally or conventionally subrogated to any claims of the nonparty residents and landowners. Nor has it briefed the law concerning contribution when payments to nonparties have been made. Additionally, Mitchell Energy is required to show the reasonableness of any settlements or compromises it has made, where it failed to first tender the settlement or compromise for approval to its co-obligors. *See*, e.g., *Molett v. Penrod Drilling Co.*, 826 F.2d 1419 (5th Cir.1987). These issues will have to be addressed at the trial of the damage issues.

2. *Gulf Central's Claim for Damages.* In addition to its claims for indemnity or contribution, Gulf Central also seeks damages in the sum of $213,628.04 for its costs to repair its pipeline and for its loss of ammonia product. We have already held that the concurrent negligence of Gulf Central, Mitchell Energy, and Shelby County caused the plaintiffs' harm. We now likewise hold that the concurrent negligence of those defendants resulted in harm to the pipeline owner, Gulf Central. In apportioning the degree of fault for causing the harm, we adopt the same percentages of fault which we previously allocated among the defendants:

| | |
|---|---|
| Gulf Central | 40% |
| Mitchell Energy | 35% |
| Shelby County | 25% |

■ Shelby County contends that Gulf Central failed to exercise reasonable care to repair its pipeline, thereby aggravating its damages. The consequences of "post-injury" negligence, as distinguished from negligence contributing to the harm, is to deny the negligent victim damages for so much of the losses as are shown to have resulted from his failure to use reasonable efforts to avoid or prevent such losses. *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 933 (5th Cir. 1979). *See also Philippe v. Browning Arms Co.*, 395 So.2d 310, 318 n. 12 (La. 1980) (on rehearing) ("The doctrine of avoidable consequences bars recovery of those damages which occurred *after the initial injury* and which might have been averted by reasonable conduct on the part of the plaintiff"); *Univerzagt v. Young Builders, Inc.*, 252 La. 1091, 215 So.2d 823, 825 (1968) ("[T]here is no doubt but that the doctrine of mitigation of damages applies in [Louisiana] ...").

Louisiana law requires that an injured person exercise the diligence and care of a man of ordinary prudence to minimize his damages. *In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982*, 764 F.2d 1084, 1091 (5th Cir.1985) (citing *Univerzagt v. Young Builders, Inc., supra); Stanley v. Guy*, 442 So.2d 579, 582 (La.App. 1st Cir.1983). "What constitutes reasonable care depends upon the circumstances of the particular case, taking into consideration time, knowledge, opportunity, and expense." *Univerzagt, supra* at 825–26.

The burden of showing that Gulf Central acted unreasonably and thus failed to minimize its damages rests with Shelby County. It must not only show that Gulf Central's conduct was unreasonable, but also that its conduct resulted in aggravating the harm. *Compare Tennessee Valley Sand & Gravel, supra* at 933. While the evidence introduced by Shelby County shows that Gulf Central did not properly shut down its pipeline according to its own operating procedures, and also failed to make available and utilize stoppling equipment that could have simplified the repairs,[14] there has been no evidence introduced to show any extra expenses that resulted from Gulf Central's repair efforts. It is our understanding that the parties have planned to fully submit evidence pertaining to costs and expenses

---

**14.** *See* Findings of Fact # 23 & # 26, *supra.*

at the trial of the damage issues. It is more appropriate that mitigation of damages be considered at that time when apportionment of damages takes place. Accordingly, we refrain from deciding the issue of Gulf Central's mitigation of its damages until the trial of the damage issues when all evidence pertaining to Gulf Central's damages are presented for decision.

### F. GULF CENTRAL'S THIRD–PARTY CLAIM AGAINST CROWN–ZELLERBACH.

Gulf Central has offered no evidence in this matter to prove its third-party claim against Crown–Zellerbach. Nor has it argued that liability should be assessed against Crown–Zellerbach. Crown–Zellerbach has moved for dismissal of Gulf Central's claim for those reasons. Post–Trial Brief of Mitchell Energy and Crown–Zellerbach at 2. Therefore, we GRANT Crown–Zellerbach's motion and DISMISS the third-party complaint of Gulf Central with prejudice on the ground that upon the facts and the law Gulf Central has shown no right to relief. Fed.R.Civ.P. 41(b), (c).

### CONCLUSIONS

In summary, we hereby hold that:

(1) Defendants Gulf Central, Mitchell Energy, and Shelby County are solidarily liable to plaintiffs for damages caused by the pipeline puncture. The apportionment of fault between the parties is as follows: Gulf Central—40%, Mitchell Energy—35%, and Shelby County—25%.

(2) Defendants Gulf Central, Mitchell Energy, and Shelby County/Reliance are not entitled to indemnification on their cross-claims. Nor are any of the defendants entitled to contribution at this time. Should any of the defendants pay plaintiffs an amount greater than its virile portion, then that defendant shall be entitled to contribution from any co-defendant that has not paid its virile portion to plaintiffs.

(3) Defendants Mitchell Energy and Shelby County/Reliance are solidarily liable to Gulf Central for its damages caused by the pipeline rupture. The apportionment of fault between the parties is Gulf Central—40%, Mitchell Energy—35%, and Shelby County—25%.

(4) Gulf Central's third-party complaint against Crown–Zellerbach is DISMISSED with prejudice pursuant to Fed.R.Civ.P. 41(b), (c).

(5) Mitchell Energy's claim for contribution from Gulf Central and Shelby County arising out of Mitchell Energy's settlement payments with nonparty landowners and residents and Gulf Central's claim of damages from Mitchell Energy and Shelby County present issues which should be addressed at the trial of the damage issues in this matter.